IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| STEVEN A. NIZIOL,<br><br>    Plaintiff,<br><br>vs.<br><br>UNION PACIFIC RAILROAD COMPANY, a Delaware corporation,<br><br>    Defendant. | 4:23-CV-3063<br><br>MEMORANDUM AND ORDER |

  The plaintiff, Steven Niziol, claims that he was fired by his former employer, the Union Pacific Railroad Company, in violation of the Federal Railroad Safety Act (FRSA), 49 U.S.C. § 20109. Union Pacific disputes that, contending that the plaintiff was actually fired for an unprotected refusal to work (*i.e.*, insubordination). Both parties have moved for summary judgment, and the plaintiff has moved to strike the opinion testimony of one of Union Pacific's expert witnesses. Filing 28; filing 57; filing 59. The Court will grant Union Pacific's motion for summary judgment, mooting the remaining motions.

BACKGROUND

  The plaintiff was hired by Union Pacific in 1998 as a laborer, and had worked for the company in a number of positions during his career, including as a foreman. Filing 61 at 1.[1] In July 2022, he was a machine operator for a

---

[1] Pursuant to NECivR 56.1, a party moving for summary judgment must include in its brief a statement of material facts about which the movant contends there is no dispute, and the party opposing summary judgment must include in its brief a concise response to that statement of facts, noting any disagreement. Properly referenced material facts in the

surfacing gang or "surf gang," tasked with repairing sections of track subject to a "slow order" (*i.e.* a speed limit) because a track inspector had found them to be defective in, for instance, alignment or elevation. Filing 63-1 at 26-27. Specifically, the job of the surf gang was to make those sections of track safe for train travel—"to tamp up the track to get it back in proper alignment" and "level the ballast and fill in the ballast so it will support the track that you've raised with the tamper." Filing 63-1 at 27.

That task requires two machines—a tamper and a ballast regulator. Filing 63-1 at 26. But before work can begin, someone has to make sure the track is clear, because a train running on the section of track the surf gang was repairing could be very dangerous. *See* filing 63-1 at 25. A track is cleared by obtaining "track authority" or "track protection" from the dispatcher, in the form of "track and time" or a "track warrant." *See* filing 63-1 at 78-79.

During most of the plaintiff's time with the surf gang, it had been a three-person crew: Two machine operators and a foreman. Filing 63-1 at 6. The foreman, the plaintiff explained, did what he called the "foreman stuff": "Gets the track, gets time for us to go out on the track, takes care of slow orders, throwing switches." Filing 63-1 at 7. But in July 2022, the surf gang had been shorthanded for some time, because its foreman had taken another job and Union Pacific had been unable to replace him. *See* filing 63-1 at 8, 78.

While the surf gang was shorthanded, they had been getting track authority with the help of track inspectors. Filing 63-1 at 11. One of the two people on the surf gang would call a track inspector and provide the mileposts for which they needed track authority, the track inspector would call the dispatcher and get track authority, and then the track inspector would call the

---

movant's statement are considered admitted unless controverted in the opposing party's response. NECivR 56.1(b)(1)(B).

surf gang back to confirm the mileposts. Filing 63-1 at 9-11, 79. Only then would the surf gang begin its work.

But the plaintiff and his companion on the two-person surf gang had been told that they would eventually have to get their own track authority. *See* filing 63-1 at 13-14, 77. Track authority could be obtained by computer or radio—computer was preferred, but if a computer was unavailable, it could be done by radio. Filing 63-1 at 96. The plaintiff had been trained on how to get track authority, and had even done it in previous jobs. *See* filing 63-1 at 11, 20, 94-95. And the job safety analysis for the plaintiff's job (operating the ballast regulator) said that the machine operator *or* foreman was required to verify track authority before occupying the track. Filing 63-1 at 19, 26, 94.

On July 7, 2022, the surf gang was asked to get its own track authority. *See* filing 63-1 at 78. The manager of track maintenance explained that on that day, he was down to six of thirteen employees—he was "short a surf gang foreman," "short a section foreman," people were on vacation, and the track inspectors who had been providing the surf gang with track protection were occupied with other duties. Filing 63-1 at 78. So, that day, he required the surf gang to get its own track authority. Filing 63-1 at 78, 83.

The plaintiff had a problem with that. He said he generally believed that a surf gang should be a three-man crew, because there was "too much going on with running machines and taking care of machines to also do the foreman duties." Filing 63-1 at 7. So, he told his manager that he didn't feel comfortable getting track authority. Filing 63-1 at 13. A conference call was convened with the surf gang, their manager, and the director of track maintenance. Filing 63-1 at 84; *see* filing 32-18 at 2.

The ensuing conversation is characterized somewhat differently by the participants, but the essential details aren't meaningfully disputed. The

director of track maintenance described the surf gang's complaints as directed at general short-handedness—that is, they felt they were being punished with extra responsibilities and that Union Pacific needed to do more to hire replacement workers. *See* filing 32-18 at 3-4. The plaintiff's account of the conversation focuses more on asserting safety concerns. *See* filing 63-1 at 13-15. But in the end, there's no dispute that the plaintiff said he believed it was unsafe for the surf gang to get their own track authority, they said they wouldn't do it, and they then went to their machines and waited for someone else to get track authority so they could proceed. *See* filing 32-18 at 4-5, 14-16; filing 63-1 at 5-6, 13-15, 26, 80, 82-84, 86. The plaintiff said he thought his manager would simply send up a track inspector, as the railroad had been doing. *See* filing 63-1 at 26. Instead, the surf gang was removed from service, and eventually the plaintiff was fired for insubordination. Filing 32-18 at 15.

STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not

those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis Cty.*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

## DISCUSSION

The purpose of the FRSA is to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 29 U.S.C. § 20101; *see CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 661-62 (1993). A plaintiff's prima facie case for a retaliation claim requires proof that (i) the plaintiff engaged in a protected activity; (ii) the railroad knew or suspected, actually or constructively, that he engaged in the protected activity; (iii) he suffered an adverse action; and (iv) the circumstances raise an inference that the protected activity was a contributing factor in the adverse action. *Neylon v. BNSF Ry. Co.*, 968 F.3d 724, 727 (8th Cir. 2020). If the employee makes that showing, the railroad is nonetheless not liable if it demonstrates, by clear and convincing evidence, that it would have taken the same unfavorable personnel action in the absence of the employee's protected activity. *Blackorby v. BNSF Ry. Co.*, 936 F.3d 733, 737 (8th Cir. 2019).

But the FRSA provides meaningfully different protection for some activities as opposed to others, and the parties disagree about which provision

is controlling. The first is protection for *reporting* safety concerns. A railroad "may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for . . . reporting, in good faith, a hazardous safety or security condition[.]" § 20109(b)(1)(A). That provision doesn't require that the report be objectively reasonable—it just requires that the employee honestly believed it. *See Monohon v. BNSF Ry. Co.*, 17 F.4th 773, 780 (8th Cir. 2021); The plaintiff thinks this is a reporting case.

Union Pacific, on the other hand, thinks this is a *refusal-to-work* case. A railroad also may not "discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for . . . refusing to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties[.]" § 20109(b)(1)(B). But the FRSA contains important qualifiers on refusal to work. Refusal is only protected if:

(A) the refusal is made in good faith and no reasonable alternative to the refusal is available to the employee;

(B) a reasonable individual in the circumstances then confronting the employee would conclude that—

    (i) the hazardous condition presents an imminent danger of death or serious injury; and

    (ii) the urgency of the situation does not allow sufficient time to eliminate the danger without such refusal; and

(C) the employee, where possible, has notified the railroad carrier of the existence of the hazardous condition and the intention not to perform further work, or not to authorize the use of the hazardous equipment, track, or structures, unless the condition is corrected immediately or the equipment, track, or structures are repaired properly or replaced.

§ 20109(b)(2). Under § 20109(b)(2)(B), refusal to work is only protected if the employee's assessment of a hazardous condition is objectively reasonable. *See Monohan*, 17 F.4th at 781.

In other words, while the FRSA protects an employee who makes a good faith report, the employee is not entitled to stop working. *Id*. Should that occur, the employee's conduct falls within the refusal-to-work provision, with its higher standard and multiple conditions to anti-retaliation protection. *See id*. at 782. And, as the Eighth Circuit has explained at length, that distinction makes practical sense. A mere *report* of a putative safety violation to the railroad itself, even if mistaken, imposes no meaningful costs on the railroad. *Id*. at 781-82 (citing *Ziparo v. CSX Transportation, Inc.*, 15 F.4th 153 (2d Cir. 2021)). An employee's *refusal to work*, on the other hand, could result in staffing issues and disruption of the work day—so, Congress weighed those higher costs and decided to provide anti-retaliation protection only in "limited, serious, and time-sensitive circumstances." *Id*. at 782.

Union Pacific's argument for summary judgment is straightforward: Union Pacific says that the plaintiff's refusal to obtain track authority wasn't a protected activity because it wasn't made in good faith or objectively reasonable. Filing 60 at 7-11. And because that's why he was fired, he wasn't fired for engaging in a protected activity. Filing 60 at 11-12.

The plaintiff, however, insists he "never refused to work." Filing 68 at 2. Rather, in the plaintiff's telling, he "in good faith, report[ed] a concern that if he were to get on-track safety for the gang, it would create a hazardous safety condition." Filing 68 at 2. Union Pacific, the plaintiff asserts, "ignores why [he] refused to get on-track safety for the gang: he thought in good faith that for him to do so would create a hazardous safety condition for his coworker, himself, and other trains or machines on the track." Filing 68 at 2.

But that describes a paradigmatic refusal-to-work case: "refusing to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties[.]" § 20109(b)(1)(B). That the "why" for refusing to work may have been a safety concern doesn't mean the plaintiff didn't refuse to work.

The plaintiff also insists that he didn't refuse to work because, after explaining to his superiors that he wouldn't get track authority, he fueled up and drove the company truck to the surf gang's machines. *See* filing 68 at 6. That means he was willing to perform *some* of the duties he had been assigned for that day—but generally speaking, it's an employer who decides what an employee's job requires, not the other way around. The plaintiff cites no authority for the implied proposition that the only way to "refuse to work" is to walk off the job completely, and the refusal-to-work limitations found in § 20109(b)(2) would be a dead letter if an employee could avoid them merely by volunteering for tasks other than those assigned. The Court sees no reason that the FRSA's refusal-to-work rubric should not be applied to an employee's refusal to perform specific duties assigned to him. *See, e.g.*, *Berberich v. Kansas City S. Ry. Co.*, No. 2:22-CV-2426, 2024 WL 521373, at \*4-5 (D. Kan. Feb. 9, 2024); *Necci v. Long Island R.R. Co.*, No. 2:16-CV-3250, 2019 WL 1298523, at \*15-16 (E.D.N.Y. Mar. 21, 2019).

And the plaintiff seems to have placed nearly all his eggs in that basket. *See* filing 68. He repeatedly characterizes the surf gang's morning conference call with their superiors as merely reporting a safety concern, sidestepping the part where the plaintiff refused to perform a necessary task that his superiors directed him to perform. And while he insists that he reported his safety concern in good faith—and on that point, at least, the Court finds genuine issues of material fact, *see Monohon*, 17 F.4th at 783-84—his brief directs the

Court to no evidence suggesting that concern was objectively reasonable. *See Tompkins v. Metro-N. Commuter R.R. Co.*, 983 F.3d 74, 80-81 (2d Cir. 2020). As the Court reads the plaintiff's brief, he isn't even arguing that his alleged safety objection was objectively reasonable. *See* filing 68.

It is, in fact, not entirely clear from the record what the plaintiff's concern actually was. In his deposition, when directly asked why getting his own track authority was unsafe, he merely said "Just not comfortable and not confident with computers, and – yeah, anyway." Filing 63-1 at 13. But he knew how to do it by radio. Filing 63-1 at 20. He might have believed it could only be done by computer, *see* filing 63-1 at 11, but if so, the record is replete with evidence he was mistaken, which can hardly be objectively reasonable. *See* filing 63-1 at 23, 53, 79, 96; *see also* filing 32-11 at 47. (His co-worker on the surf gang, for instance, clearly knew radio was an option. *See* filing 32-11 at 47.) Where there is a safe, reasonable alternative—such as obtaining track authority by radio, as the plaintiff had done in the past—refusal to use that workaround will typically take conduct over the line from protected (refusal to engage in unsafe work) to unprotected (refusal to use the alternative). *Brousil v. United States Dep't of Lab., Admin. Rev. Bd.*, 43 F.4th 808, 812 (7th Cir. 2022)

The plaintiff also suggested that he was concerned more generally with a two-person surf gang: He "believe[d] there is too much going on with running machines to also do the foreman duties." Filing 63-1 at 7. But the surf gang had to get track authority before actually working on the track, meaning that the act of getting track authority itself wouldn't have created a distraction. And the plaintiff clearly was prepared to actually work on the track with only a two-man crew, as proved by his insistence even now that he was willing to do so.

The closest the plaintiff comes to identifying any evidence suggesting that his stated belief was objectively reasonable is the following:

> It needs to be noted that [the plaintiff] did have a valid reason to object to getting on-track safety for the gang. The record is replete with references to Defendant Union Pacific Railroad's GCOR and Safety Rules; its Safety Policies; and, of course, the Federal Railroad Safety Act, 20109(b)(1)(A).
>
> [The plaintiff] was warranted in putting his trust in the Safety Rules promulgated by the Union Pacific Railroad; the Safety Policies it espoused; and a common-sense position supported by these Safety Rules and Policies. Above all else, [the plaintiff] exercised good judgment in reporting to his supervisors that he did not feel comfortable, did not feel safe obtaining on-track safety for the gang.

Filing 68 at 7. But nowhere in his briefs has the plaintiff identified a *specific* rule or policy justifying his refusal to obtain track authority. *See* filing 29; filing 48; filing 68. Rather, he refers repeatedly to *general* statements about safety priorities and a culture of safety. *E.g.* filing 31 at 28-31. But that does not show how he was objectively reasonable in refusing a task that he had done before, he had been trained to perform, and he had been told he would eventually have to complete, based on an alleged subjective discomfort with the chore.

With that settled, the Court returns to the plaintiff's prima facie case: that (i) he engaged in protected activity, (ii) the railroad knew it, (iii) he suffered an adverse action; and (iv) the circumstances raise an inference that the protected activity was a contributing factor in the adverse action. *See Neylon*, 968 F.3d at 727. He did engage in a protected activity when he complained about safety to his supervisors, obviously the railroad knew, and he clearly suffered an adverse action. But the circumstances don't raise an inference that his *complaint* about safety, standing alone, was a contributing

- 10 -

factor to his firing. After he complained, his supervisors tried at length to reassure him, resolve the impasse, and persuade him to do what he was asked.

A contributing factor is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Kuduk v. BNSF Ry. Co*, 768 F.3d 786, 791 (8th Cir. 2014). The contributing-factor standard is more lenient than the causation standard applied in other employment-retaliation contexts, and it "does not require that the employee conclusively demonstrate the employer's retaliatory motive." *Id*. But it is not enough for an FRSA claimant to show a mere factual connection between the protected activity and his or her termination. Rather, the claimant must show that the employer's discipline was, at least in part, intentional retaliation prompted by his safety report. *See Heim v. BNSF Ry. Co.*, 849 F.3d 723, 727 (8th Cir. 2017).

And here, the record establishes that the reason for the plaintiff's termination was his refusal to do as he was told, not the safety complaint he proffered as his reason for refusing. An employee who engages in protected activity is not insulated from adverse action for violating workplace rules, and an employer's belief that the employee committed misconduct is a legitimate, non-discriminatory reason for adverse action. *Gunderson v. BNSF Ry. Co.*, 850 F.3d 962, 969-70 (8th Cir. 2017). The plaintiff's report of a safety concern might have been protected activity, but his refusal to work was not, and it was his refusal to work that resulted in his firing.

## CONCLUSION

For the foregoing reasons, the Court finds that the plaintiff has failed to make his prima facie case for retaliation in violation of the FRSA. The Court will grant Union Pacific's motion for summary judgment on that basis. The

plaintiff's request for partial summary judgment on certain elements of his claim is, accordingly, moot.

The plaintiff also moved to strike opinion testimony from an expert witness proffered by Union Pacific. The Court has not relied on that testimony in ruling on Union Pacific's motion for summary judgment, so the plaintiff's motion to strike is similarly moot.

IT IS ORDERED:

1. Union Pacific's motion for summary judgment (filing 59) is granted.

2. The plaintiff's complaint is dismissed.

3. The plaintiff's motion for partial summary judgment (filing 28) is denied as moot.

4. The plaintiff's motion to strike (filing 57) is denied as moot.

Dated this 26th day of September, 2024.

BY THE COURT:

John M. Gerrard
Senior United States District Judge